IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

            Plaintiff-Appellee,

vs.

ROBERT CUFF,

            Defendant-Appellant.

C.A. No. 18-30694

DC 5:11-CR-00062-21
(W.D. Louisiana)

_____

**BRIEF IN SUPPORT OF MOTION FOR CERTIFICATE OF**

**APPEALABILTY**

Michael R. Levine, Oregon Bar #931421
LEVINE & MCHENRY, LLC
1001 S.W. Fifth Avenue, Suite 1414
Portland, Oregon 97204
Phone: 503-546-3927
cell:  503-939-4334
www.levinemchenry.com
e-mail: michael@levinemchenry.com

i

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................. ii

I.  STATEMENT OF THE CASE .................................................1

   A. Introduction .........................................................................1

    B. Procedural History..............................................................3

  II. SUMMARY OF  ARGUMENT……………………………….......17

III. ARGUMENT…………………………………………………………20

A. THE COURT SHOULD GRANT A COA ON THE ISSUE OF
    WHETHER THE GOVERNMENT BREACHED THE PLEA
    AGREEMENT……………………………………………..………20

B.  THE COURT SHOULD GRANT A COA ON THE ISSUE OF
WHETHER TRIAL COUNSEL WAS INEFFECTIVE IN NOT
ADEQUATELY INVESTIGATING CUFF'S MENTAL CONDITION AND
VIABLE DEFENSES BEFORE ADVISING HIM TO PLEAD
GUILTY………………………….................................................32

C. THE COURT SHOULD GRANT A COA ON THE ISSUE OF
WHETHER TRIAL COUNSEL WAS INEFFECTIVE IN NOT MOVING
FOR A COMPETENCY HEARING BEFORE SENTENCING………..…37

D. THE COURT SHOULD GRANT A COA ON THE ISSUE OF
WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN
DENYING THE RULE 59 MOTION TO RECONSIDER ITS OPINION
DENYING THE 2255 MOTION…………………………….………49

IV. CONCLUSION……………………………………….…….……..58

APPENDIX

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003) .......................................36

*Anderson v. United States*, 865 F.3d 914 (7th Cir. 2017).........................46, 47

*Berger v. United States*, 295 U.S. 78 (1935) ..................................................30

*Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990)…………………..37

*Buck v. Davis*, 137 S. Ct. 759 (2017)..............................................................31

*Bousley v. United States*, 523 U.S. 614 (1998)...............................................30

*Drope v. Missouri*, 420 U.S. 162 (1975) ........................................................37

*Cook v. U.S. Atty. Gen.*, 488 F.2d 667 (5th Cir. 1973) ..................................36

*Diaz v. Martin*, 718 F.2d 1372 (5th Cir. 1983)...............................................33

*Escamilla v. Stephens*, 749 F.3d 380 (5th Cir. 2014) ................................33, 36

*Galbraith v. United States*, 313 F.3d 1001 (7th Cir. 2002) ...........................23

*Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995)………………………………49

*Mata v. Johnson*, 210 F.3d 324 (5th Cir. 2000).............................................37

*Maxwell v. Roe*, 606 F.3d 561 (9th Cir. 2010)...............................................48

*Miller-El v. Cockrell,* 537 U.S. 322 (2003)…………………..………32, 39

*Padilla v. Kentucky*, 559 U.S. 356, 364 (2010)…………………………..32

*Porter v. McCollum*, 558 U.S. 30, 36 (2009)………………………………40

*Santobello v. New York,* 404 U.S. 257 (1971) ...........................................20, 29

*Struck v. Cook County Public Guardian,*
901 N.E.2d 946 (Ill. App. 2008) ....................................................................46

*Slack v. McDaniel,* 529 U.S. 473 (2000) .......................................................31

*Strickland v. Washington*, 466 U.S. 668, 691 (1984)………………………33

*Theriot v. Parish of Jefferson,* 185 F.3d 477 (5th Cir. 1999) ........................22

*United States  v. Al-Arian*, 514 F.3d 1184 (11th Cir. 2008) ...........................25

*United States v. Annabi,* 771 F.2d 670 (2d Cir.1985)....................................28

*United States v. Borders*, 992 F.2d 563 (5th Cir. 1993) .................................20

*United States v. Cantu*, 185 F.3d 298 (5th Cir. 1999) ....................................27

*United States v. Cantu*, 12 F.3d 1506 (9th Cir. 1993). ...................................40

*United States v. Cates*, 952 F.2d 149 (5th Cir. 1992) .....................................20

*United States v. Ceron*, 775 F.3d 222 (5th Cir. 2014) ....................................22

*United States v. Edwards*, 488 F.2d 1154 (5th Cir. 1974).............................33

*United States v. Elashyi*, 554 F.3d 480 (5th Cir. 2008) ............................20, 26

*United States v. Escobedo*, 757 F.3d 229 (5th Cir. 2014)...............................23

*United States v. Gaudet*, 81 F.3d 585 (5th Cir. 1996) ....................................21

*United States v. Gebbie,* 294 F.3d 540 (3d Cir. 2002)....................................27

*United States v. Grandinetti*, 564 F.2d 723 (5th Cir. 1977) ...........................30

*United States v. Harper*, 643 F.3d 135 (5th Cir. 2011) ..................................20

*United States v. Hartwell*, 302 F.Supp.2d 609 (E.D.Va. 2004)......................26

*United States v. Harvey*, 791 F.2d 294 (4th Cir. 1986) ....................................28

*United States v. Martinez-Molina*, 64 F.3d 719 (5th Cir. 1995).....................47

*United States v. McPhee*, 731 F.2d 1150 (5thCir. 1984)................................30

*United States v. Palomo*, 998 F.2d 253 (5th Cir. 1993).................................20

*United States v. Taylor*, 77 F.3d 368 (11th Cir. 1996) .............................29, 31

*United States v. Tovar-Valencia*, 2011 WL 6749051 (S.D.Tex. 2011)..........25

*United States v. Van Thournout,* 100 F.3d 590 (8th Cir.1996)......................27

*Waltman v. International Paper Co*., 875 F.2d 468 (5th Cir. 1989) ..............49

*Weeden v. Johnson*, 854 F.3d 1063 (9th Cir. 2017) ......................................33

## **Statutes & Rules**

Rule 59, Federal Rules of Civil Procedure ..........................................2, 17, 49

28 USC § 2255.................................................................................... *passim*

## **Other Authorities**

American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-V) .............................................................................

# I. STATEMENT OF THE CASE

## A. Introduction

Pursuant to a plea agreement in case *United States v. Cuff*, 5:11-CR-00062-21, Robert Cuff, a Navy veteran, pleaded guilty in the Western District of Louisiana to engaging in a child exploitation enterprise (CEE), in connection with an internet file-sharing website.  Cuff shared child pornography with other members of the website.  During this time, Cuff was also being investigated in the Western District of Texas for sexual abuse of a child, stemming from videos found on his computer portraying such conduct. Cuff and his lawyer, Stephen Karns, understood the Louisiana plea agreement to promise that Cuff would not be prosecuted in Texas for the criminal conduct displayed in the videos, but that the conduct would be used in the Louisiana sentencing proceeding.  However, notwithstanding the plea agreement, two weeks after the Louisiana plea and unbeknownst to Cuff and his attorney, Cuff was secretly indicted in the Western District of Texas in *United States v. Cuff*, 11-CR-03016-KC, for possession of child pornography and for sexual contact with a minor, the very conduct displayed in the videos. ROA.18-30694.260-264.

During the Louisiana guilty plea colloquy, Cuff's statements to the district court judge were strange and illogical at times.  The trial court

1

expressed concern about Cuff's mental state, but not his competence. After the plea, but before sentencing, several highly experienced mental health professionals concluded that Cuff very likely suffered brain damage from his past use of the anti-malarial drug mefloquine, a drug he had been ordered to take during his military service. Based on the conclusions of the mental health professionals, Cuff, represented by a new attorney, moved to withdraw his plea. That motion was denied, and the district court sentenced him to life imprisonment. His direct appeal was denied by this Court.

Cuff then filed a motion pursuant to 28 U.S.C. § 2255 alleging the government had breached the plea agreement by charging him in Texas. He also alleged that Karns was ineffective in not adequately investigating his mental state and possible mental defenses before advising him to plead guilty. Cuff also alleged Karns was ineffective in not moving for a competency hearing before sentencing. More than three years after the Section 2255 motion was filed, the district court denied the motion and denied a Certificate of Appealability (COA). The court also denied a subsequent motion to alter the judgment made pursuant to Rule 59 of the Federal Rules of Civil Procedure. Cuff filed a timely notice of appeal to this Court from the district court's denial of the motions. Cuff now asks the Court to grant a COA on each of the issues set forth herein.

2

**B. Procedural history.**

In 2011, investigators in the Western District of Louisiana determined that Cuff was uploading and exchanging child pornography with others in an internet pornography ring. While conducting a search of Cuff's house pursuant to a warrant, law enforcement officers in the Western District of Texas seized a computer containing multiple video files. The files included videos of Cuff sexually abusing a five-year-old girl, the daughter of a woman with whom Cuff had been involved.

   1. The Louisiana indictment.

On August 10, 2011, a federal grand jury in the Western District of Louisiana returned a superseding indictment charging Cuff with one count of engaging in a child exploitation enterprise, in violation of 18 U.S.C. §2252A(g) (Count 1), one count of conspiracy to advertise the distribution of child pornography in violation of 18 U.S.C. §§ 2251(d)(1) and (e) (Count 2), and one count of conspiracy to distribute child pornography in violation of 18 U.S.C. §§ 2252A(a)(2)(A) and (b)(1) (Count 3). ROA.18-30694.77-91.

On October 17, 2011, and October 27, 2011, on defendant's motion, the district court entered orders permitting mental health professionals to interview Cuff to evaluate his mental status. ROA.18-30694.116.117. The

government was represented in the Western District of Louisiana by Assistant United States Attorney Luke Walker, and in the Western District of Texas by Assistant United States Attorney Brandy Gardes. Cuff, represented by Karns, understood from AUSA Walker and AUSA Gardes that if Cuff pleaded guilty in the Western District of Louisiana, there would be no prosecution in the Western District of Texas. ROA.18-30694.256-258. Karns and Cuff understood, however, that AUSA Walker in Louisiana would use the video tapes recovered in Texas in the Louisiana sentencing. *Id*. The prosecutors advised Karns of this resolution because they hoped to avoid having the girl in the video testify at a Texas trial. ROA.18-30694.256.

### 2. The Louisiana guilty plea and the Texas indictment.

On December 1, 2011, Cuff pleaded guilty to the CEE crime in violation of 18 U.S.C. § 2252A (g). ROA.18-30694.856-885. The plea agreement expressly provided that if Cuff fulfilled his obligations under the agreement, then "the Government agree[s] to dismiss the remaining counts of the superseding indictment after sentencing and it will not prosecute the defendant for any other offense known to the United States Attorney's Office, based on investigation which forms the basis of the Second Superseding Indictment." ROA. 18-30694.976-977.

Karns and Cuff understood the agreement to confirm that Cuff

4

would not be prosecuted in the Western District of Texas.  However,

unbeknownst to Karns and Cuff, and notwithstanding the plea agreement,

two weeks later on December 14, 2011, a federal grand jury in the Western

District of Texas returned a sealed indictment in Case No. 11-CR-3016 on

several counts of possession of child pornography and one count charging,

sexual abuse of the five year-old girl, which conduct was depicted on the

video filed found on Cuff's computer.  ROA.18-30694.260-264.

On the same day the indictment was returned, the government

moved the Texas district court to seal the indictment on the purported

ground that "disclosure of the indictment would seriously jeopardize the

ability of law enforcement officers to locate and apprehend him."

ROA.18-30694.265. The Texas district court ordered the indictment sealed

the same day.  ROA.18-30694.266.

### 3. The presentence report.

On July 25, 2012, the final presentence investigation report (PSR) was

issued.  ROA.18-30694.997-1013. The PSR calculated a total offense level of

43, reflecting a five-level increase pursuant to U.S.S.G. §§ 4B1.5(b)(1)

because the defendant "engaged in a pattern of activity involving prohibited

sexual conduct," namely the sexual abuse of the five-year old child, which

was displayed on video files found on the defendant's computer. ROA.18-

30694.1004. The PSR stated that the government had no evidence that these video files were ever uploaded to the internet but *incorrectly* noted that "presently, no charges are pending against the defendant as a result of this behavior." PSR ¶ 22. ROA. 18-30694.1002. Cuff's total offense level of 43 and his Criminal History Category of I correlated to an advisory range of life in prison. No objections to the PSR were filed by any party. Sentencing was ultimately set for July 13, 2012.

    4. <u>The mental health evaluations, diagnosis of mefloquine intoxication, and Cuff's seizure while incarcerated.</u>

    On May 10, 2012, two months before sentencing, at defense request, Dr. Remington Nevin examined Cuff's medical history, communicated by telephone with Cuff, and with members of his family. Dr Nevin had a post-doctoral fellowship at John Hopkins University, was Board Certified in Preventive Medicine, and is an expert on the connection between the use of mefloquine and resulting brain damage. See Resume at ROA.18-30694.684-698. He has published much research resulting from clinical examinations of military and civilian personnel experiencing the effects of mefloquine. *See e.g.* Ritchie, Block, Nevin, *Psychiatric Side Effects of Mefloquine*, J. Am. Academy Psychiatry Law 41:224-35 (2013). ROA.18-30694.645-656. *See also* Nevin and Ritchie, *The Mefloquine Intoxication Syndrome*, (Springer International Publishing 2015). ROA.18.30694.662-683.

Dr. Nevin prepared a comprehensive report with respect to his conclusions regarding mefloquine's deleterious effect on Mr. Cuff.  ROA.18-30694.1224-1226, 566.  Dr. Nevin related that Cuff reported symptoms of "abnormal dreams, anxiety, and paranoid reactions" as well as "profound short-term memory loss." ROA.18-30694.1225. Although Dr. Nevin did not physically examine Cuff, he concluded that Cuff's personality changes and symptoms were "consistent with possible late neurotoxic effects of limbic encephalopathy caused by repeated mefloquine intoxication," resulting from Cuff's use of the anti-malarial drug while in the military.  ROA.18-30694.567, 1225.  Dr. Nevin explained that mefloquine intoxication has been associated with "a morbid fascination with violence and violent objects, aggression, increased impulsivity, and *sexual inhibition.*"  *Id.* (emphasis added).  In a subsequent affidavit filed on July 12, 2012, Dr. Nevin observed that the areas of the brain that effect sexual deviancy "include the thalamus and the hypothalamus [and that each area] is likely affected by mefloquine, based on signs and symptoms observed in cases known to me." ROA.18-30694.170-171.

About May 18, 2012, Cuff was found unresponsive in his cell after complaining the prior evening of a headache.  ROA.18-30694.563. He was taken to LSU Health Center where he was admitted with a diagnosis of

"altered level of consciousness and altered mental status, with a Glasgow

Coma Scale of 3." *Id.* In Dr. Nevin's opinion, Cuff's symptoms were

"highly suspicious for a deep brain or brainstem seizure" and provided

"further support for the diagnosis of neurotoxic injury from his earlier use of

mefloquine." *Id.* Dr. Nevin reviewed additional records and concluded that

they "further substantiate[d] the assessment" that Cuff likely "suffered a deep

brain or limbic seizure related to neurotoxicity from his early use of

mefloquine," and that his condition was "chronic and unstable." *Id.*

Dr. Robert Stanulis is a highly experienced forensic psychologist and

neuropsychologist. For sixteen years he was the chief neuropsychologist at

the Oregon Comprehensive Epilepsy and Surgery program. ROA.18-

30694.1214. In that capacity, he evaluated many individuals before, during,

and after neurosurgery. *Id.* Dr. Stanulis has extensive experience and

knowledge about the role of limbic structures in behavior "including the

impact of limbic dysfunction on seizure disorders, perseverative obsessive

behavior, aggression, and sexual behavior." *Id.*

Dr. Stanulis examined Cuff over two days and concluded that Cuff's

criminal behavior was "to a reasonable degree of medical and psychological

certainty caused by and the direct result of the adverse side-effects of the

mefloquine he was ordered to take in the military." ROA.18.30694.1213. In

8

his opinion Mr. Cuff's criminal behavior was "but a part of the profound

neuropsychological and neurobehavioral changes resulting from disinhibition

caused by the limbic encephalopathy diagnosed by Dr. Nevin."

ROA.18.30694.1217.

5. Karns' sentencing memorandum.

On June 29, 2012, Karns filed a sentencing memorandum with an

incorporated motion for downward departure.  ROA.18-30694.1122-1151.

He urged the district court to impose a sentence of not more than 20 years.

Karns attached the psychological reports of Dr. Nevin, Dr. Stanulis, Dr.

Vigen, and Dr. William Brown.

Karns also attached letters attesting to Cuff's exemplary work record

while serving in the United States Navy.  The exhibits showed Cuff was a

retired sailor who served in the Navy for more than 28 years.  He rose to the

rank of Command Master Chief and received numerous medals and awards,

including the Iraq Campaign Medal with Star, the Meritorious Unit Service

Medal, the Navy/Marine Corps Commendation Medal, the Global War on

Terrorism Expeditionary Medal, the Global War on Terrorism Service

Medal, and the Joint Service Commendation Medal.  ROA.18-30694.1123-

1124.

*6*. Schweitzer's motions to substitute counsel and withdraw the guilty plea.

On July 5, 2012, shortly before the scheduled sentencing hearing, Cuff's family retained attorney Eric H. Schweitzer, who filed a motion to substitute in as counsel to replace Karns. ROA.18-30694.134. In his motion Schweitzer asserted that Cuff suffered from brain damage from the use of mefloquine that might well constitute a defense to the charges. ROA.18-30694.135-136. He asserted that Karns was incapable of providing Cuff with competent legal advice in that regard. ROA.18-30694.137. In addition to his motion, Schweitzer attached a draft motion to withdraw Cuff's guilty plea. ROA.18-30694.143-159. Schweitzer also requested a further continuance of the sentencing proceedings.

On July 10, 2012, the district court denied Schweitzer's motion to substitute counsel but permitted him to act as co-counsel.  The court also denied the request for a further continuance.  ROA18-30694.167-168.

On July 12, 2012, the day before the sentencing hearing, Schweitzer filed the motion to withdraw Cuff's guilty plea. ROA.18-30694.174-182. The government opposed the motion in a response filed the next day.  ROA.18-30694.183-187. In the motion, Schweitzer asserted that the plea had been entered without Cuff or Karns knowing or having investigated the defenses available to Cuff to the accusations made against him.  Schweitzer asserted

that according to Doctors Nevin and Stanulis, Cuff suffered from brain

damage arising from his use of the anti-malarial drug mefloquine, which he

had been ordered to take while in the military.  Schweitzer stated that

mefloquine has well known deleterious, psychiatric side effects.  Schweitzer

argued that Cuff had defenses available of diminished capacity and insanity.

In support of his motion, Schweitzer presented the district court with a

widely publicized CBS news report regarding mefloquine's side effects:

> Last summer, four soldiers from Ft. Bragg were accused of
> killing their wives. Two of the men committed suicide, and the
> other two await trial…One possible suspect was mefloquine -
> brand name Lariam, an anti-malarial drug. It was invented by
> the U.S. Army and is routinely given to soldiers deployed
> overseas. In scientific terms, Lariam can cause neuropsychiatric
> adverse events. In plain language, it can make lose your
> mind….

David Kohn, the Dark Side of Lariam,
http://www.cbsnews.com/2100-500164_162-538144.html
(2009).

ROA.18-30694.176.

Pointing to the evaluations of Dr. Nevin and Dr. Stanulis, Schweitzer

argued that when Cuff took mefloquine around 1993, the drug damaged his

brain, rendering him incapable of controlling unnatural urges. ROA. 18-

30694.176. Schweitzer moved to withdraw the plea and for a trial before the

judge alone, at which time the defense of insanity would be raised.  ROA.18-

30694.181-182.

7. <u>The sentencing hearing.</u>

On July 13, 2012, the district court conducted a sentencing hearing during which it also considered the motion to withdraw the guilty plea. In essence, the court found that the conclusions of Dr. Nevin and Dr. Stanulis about the effects of mefloquine on Cuff's mental state were "more cutting-edge theory than . . . accepted fact." ROA.18-30694.893. The court reasoned that Cuff carried out his job in the military with competence, but the sexual assault displayed on the video showed a criminal personality.

The court denied the motion to withdraw the plea. The court also denied the motion for downward departure and sentenced Cuff to life in prison. ROA.18-30694.193-195 (judgment).

8. <u>The direct appeal.</u>

On August 7, 2013, in an unpublished memorandum decision, this Court affirmed the defendant's conviction and sentence. *United States v. Cuff*, 538 Fed.Appx. 411. ROA.18-30694.213-217. The Court rejected Cuff's claim that his plea was not entered knowingly and intelligently reasoning as follows:

> The record reflects that, at the time of the re-arraignment, Cuff was regarded by his supervisors and peers as high functioning, his demeanor was not unusual, and no medical opinions bearing on competency had been presented. During the plea colloquy, Cuff responded to questions appropriately with no indication of mental deficiencies. There is no reason to believe that Cuff did

not comprehend and could not participate in the criminal
proceedings.

*Id*. at 413; ROA.18-30694.214, 215.

On appeal Cuff raised the issue of prosecutorial misconduct with
respect to the "the secret Texas prosecution" and claimed that this
prosecution prevented him from entering a constitutionally valid guilty plea.
The Court did not address the claim, stating that Mr. Cuff did not develop
facts supporting the claim on appeal.  *Id.*  On December 9, 2013, the United
States Supreme Court denied Cuff's petition for a writ of certiorari. ROA.18-
30694.219.

9. The motion pursuant to 28 USC § 2255.

On December 6, 2014, represented by attorney Steven Hormel, Cuff
moved to vacate his conviction and sentence pursuant to 28 USC. § 2255.
ROA.18-30694.237, 324. Among other things, Cuff raised the following
claims: (1) The government breached its promise in the plea agreement not to
prosecute Cuff for another offense; (2) Attorney Karns was ineffective for
failing to move for a competency review before the sentencing under 18
U.S.C. § 4241; and (3) Attorney Karns was ineffective for failing to
investigate mental defenses of insanity or involuntary intoxication before
advising Cuff to plead guilty.

In connection with the claim of breach of the plea agreement, Cuff introduced the declaration of Karns. ROA.18-30694.255-259. The declaration, dated December 3, 2014, was obtained after conclusion of the direct appeal. In his declaration Karns stated that he understood from the Assistant United States Attorneys in Louisiana and Texas that Cuff would only be prosecuted in Louisiana, not in Texas, although the videos seized in Texas would be used in the sentencing proceedings in Louisiana.

Karns "learned from AUSA Gardes that the State of Texas would not be prosecuting Mr. Cuff." ROA.18-30694.256. This would avoid having to have the young girl testify at a trial. *Id.* Karns so advised Cuff. Karns declared that his advice to Cuff to enter the guilty plea was predicated on the understanding that if he pleaded guilty in Louisiana case, Texas would not prosecute him. ROA.18-30694.257. Karns declared he was unaware of the Texas indictment (which had been filed under seal). He said that had he been informed of its existence, he would have advised Cuff not to plead guilty in Louisiana. ROA.18-30694.255. Karns declared that in filing the Texas indictment, "the government breached the plea agreement with Cuff." ROA. ROA.18-30694.258. Karns declared that because of his failure to advise Cuff of the Texas indictment, Cuff's plea of guilty was not knowingly and intelligently entered and should, therefore, be vacated. ROA.18-30694.258.

Karns further declared that had he learned of the indictment before the

sentencing, he would have moved the district court to vacate the guilty plea.

*Id*.

On February 18, 2015, in the Western District of Texas, after receiving

reports from the BOP that Cuff was not mentally competent to proceed,

Judge Kathleen Cardone dismissed the Texas indictment on motion of the

government. Appendix 1. Pursuant to Fed.R.Ev. 201(c), the court is requested

to take judicial notice of the dismissal.

On March 12, 2018, after having the matter under submission for more

than three years, the district court in Louisiana denied Cuff's motion to

vacate his conviction in a written opinion.  ROA.18-30694.425-442. The

court also denied a COA, holding that Cuff had failed to demonstrate a

substantial showing of the denial of a constitutional right.  ROA.18-

30694.442. The court addressed the 2255 petition as follows:

First, the court did not reach the merits of the claim that the

government breached the plea agreement.  The court said the claim was

procedurally barred because Cuff had failed to show cause for his failure to

raise the claim on direct appeal.  The court stated that appellate counsel

should have obtained Karns's declaration "at the time he filed his Notice of

Appeal."  ROA.18-30694.431.

Second, the court denied the claim that Karns was ineffective in failing to move for a competency hearing before Cuff entered his guilty plea or before sentencing. The court pointed to the plea colloquy and to the statements of Cuff, Karns and the U.S. Attorney that Cuff was competent. ROA.18-30694.435.

Third, the court denied the claim that Karns was ineffective in advising Cuff to plead guilty because he failed to investigate mental defenses such as insanity, involuntary intoxication, and diminished capacity. The court said, "The decision not to pursue the insanity defense was strategic in the hopes of getting Cuff the best possible deal." ROA.18-30694.436. The court stated further that "Karns had the opportunity to examine Cuff's medical evaluations and chose not to pursue a mental defense. Karns' actions are entitled to heavy deference." *Id*.

The court remarked that Cuff's actions, specifically with the five-year old girl, were not "connected to insanity" but rather were "connected to a very cold, calculating purposeful defendant." The court concluded further that Karns was not ineffective in failing to further investigate Cuff's potential mental defenses "because such defenses would not have been viable." ROA. 18-30694.438.

### 10. The filing of the Rule 59 motion

Cuff then retained undersigned counsel Michael R. Levine, who filed a motion to alter or amend the judgement under FRCP 59(e). ROA.18-30694.453. The motion was supported with a memorandum and numerous exhibits.  ROA.18-30694.486-797. The district court denied that motion on April 12, 2018.  ROA.18-30694.798. The court reasoned, "Nothing asserted in Cuff's Motion moves the Court to alter or amend its prior judgment.  Cuff continues to make the same claims asserted in his federal habeas corpus petition."  *Id*.  Cuff filed a timely notice of appeal from the denial of both the Section 2255 motion and the Rule 59(e) motion on June 1, 2018.  ROA.18-30694.817.

## II. SUMMARY OF ARGUMENTS

A. The Court should grant a COA on the first issue of whether the government breached the plea agreement.  Contrary to the opinion of the district court, Cuff has established "cause" for failure to raise the issue on direct appeal because he was unaware of the Texas indictment until after the proceedings in the district court were completed and therefore could not make the appropriate record in that court.  He could not introduce new evidence or a new issue for the first time on appeal.

On the merits, the government breached the promise in the Louisiana plea agreement that the government would not bring any charges in Texas. Moreover, the government secretly indicted Cuff in Texas and misled the judge there to seal the indictment to keep Cuff from learning of its existence. Because reasonable jurists could debate whether the government breached the plea agreement, Cuff has met the threshold for issuance of a COA.

B. The Court should grant a COA on the second issue of whether trial counsel was ineffective in inadequately investigating Cuff's mental condition and mental defenses before advising him to plead guilty. Cuff's attorney Karns only began an adequate investigation after Cuff pleaded guilty. Only then did he learn that while in the military Cuff had been exposed to the anti-malarial drug mefloquine, well-known for its serious neuropsychiatric effects including sexual disinhibition. Only then did Karns learn from Dr. Nevin and Dr. Stanulis that because of the brain-damaging effects of mefloquine, Cuff had viable mental defenses to the charges. Because reasonable jurists could debate whether Karns adequately investigated Cuff's mental health and possible mental defenses, Cuff has met the threshold for issuance of a COA.

C. The Court should grant a COA on the third issue of whether trial counsel was ineffective in failing to move for a competency hearing before sentencing. Cuff's sometimes strange and incoherent statements at the plea

18

hearing, his assertion that he had PTSD but "believed" it was not affecting him, and the reports of Dr. Nevin, Dr. Stanulis and other psychologists and psychiatrists regarding brain damage caused by mefloquine strongly suggested that there was a competency issue even before entry of the plea much less before sentencing. Because reasonable jurists could debate whether Karns was ineffective in failing to move for a competency hearing before sentencing, Cuff has met the threshold for issuance of a COA.

D. The Court should grant a COA on the fourth issue of whether the trial court abused its discretion in denying the Rule 59 motion to reconsider its opinion denying the 28 USC § 2255 motion. Cuff presented several significant pieces of new evidence to the district court that should have caused the court to reconsider its opinion. For example, Cuff presented a Health Services Report from the Bureau of Prisons dated January 9, 2018, observing that Cuff suffered from "mefloquine brain disorder." In addition, Cuff presented new evidence that the U.S. and U.K. militaries have ceased or limited use of mefloquine due to its deleterious neuropsychiatric effects. Cuff also introduced several scientific studies regarding the deleterious neuropsychiatric symptoms in military members who used mefloquine. Because reasonable jurors could debate whether the district court abused its

discretion in denying the Rule 59 motion, Cuff has met the threshold for

issuance of a COA.

## III. ARGUMENTS

### A. THE COURT SHOULD GRANT A COA ON THE ISSUE OF WHETHER THE GOVERNMENT BREACHED THE PLEA AGREEMENT.

It is well-settled law that if a guilty plea "rests in any significant degree

on a promise or agreement of the prosecutor, so that it can be said to be part

of the inducement or consideration, such promise must be fulfilled."

*Santobello v. New York,* 404 U.S. 257, 262 (1971). This Court has held that

the government "must strictly adhere to the terms and conditions of its

promises." *United States v. Harper*, 643 F.3d 135, 139 (5th Cir. 2011). Plea

agreements are "strictly construed against the Government as the drafter."

*United States v. Elashyi,* 554 F.3d 480, 501 (5th Cir. 2008).

It is equally well-settled that a guilty plea based on a breached plea

agreement "is subject to collateral attack under § 2255." *United States v.*

*Cates*, 952 F.2d 149, 151–52 (5thCir. 1992). *See also United States v.*

*Borders*, 992 F.2d 563, 566 (5th Cir. 1993) ("A defendant may collaterally

attack his guilty plea on the grounds of an alleged violation of the plea

agreement."). Whether the government's conduct violated the terms of the

plea agreement "is a question of law." *United States v. Palomo*, 998 F.2d 253, 256 (5th Cir. 1993) (quotation omitted).

The plea agreement at issue here provides, in pertinent part, that "[i]f the Defendant completely fulfills all of his obligations and agreements under this plea agreement, the Government agrees to dismiss the remaining Counts of the Second Superseding Indictment after sentencing *and it will not prosecute the Defendant for any other offense known to the United States Attorney's Office, based on the investigation which forms the basis of the Second Superseding Indictment*." ROA.18-30694.976-977. (emphasis added). Unbeknownst to Cuff and his counsel, however, the Government obtained a secret Indictment in the Western District of Texas that charged possession of pornography and sex abuse of the child, the video of which conduct was found on Cuff's computer and which conduct enhanced his Louisiana sentence. The government's action breached the plea agreement.

1. Cuff has established "cause" for failure to raise the issue on direct appeal.

When raising issues of jurisdictional or constitutional magnitude for the first time on collateral review, "a defendant ordinarily must show both cause for his procedural default and actual prejudice resulting from the error." *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996). In its opinion denying relief, the district court held that it would not reach the

merits of this claim because Cuff could not show "cause and prejudice" for

failing to raise the claim on direct appeal. ROA.18-30694.431-432. The

court acknowledged that Karns stated in his declaration that he was unaware

of the indictment in Texas and that had he been, he would never have advised

Cuff to plead guilty; however, the court held that appellate counsel should

have presented the declaration to the Court of Appeals. ROA.18-30694.432.

Contrary to the district court's holding, Cuff had good cause for not

raising the issue of breach of the plea bargain on appeal: he had nothing in

the record of the district court on which to base the appeal. As this Court

noted in its memorandum decision denying the appeal with respect to another

issue, "[a]lthough Cuff complains of prosecutorial misconduct, he did not

develop the facts supporting this claim, so we are not able to review it on

appeal." ROA.18-30694.217.

The claim of breach of the plea agreement could not be raised in the

district court because at the time neither Cuff not his attorney Karns was

aware that the breach had occurred. ROA.18-30694.255-259. It is true that

by the time of the direct appeal, appellate counsel was aware of the Texas

indictment; however, the court of appeals reviews errors only "based on the

record before the district court." *United States v. Ceron*, 775 F.3d 222, 226

(5th Cir. 2014). This Court "may not consider new evidence furnished for

22

the first time on appeal and may not consider facts which were not before the district court at the time of the challenged ruling." *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 n.26 (5th Cir. 1999). *See also Galbraith v. United States*, 313 F.3d 1001, 1007 (7th Cir. 2002) ("[a] reviewing court on direct appeal is limited to the record of trial and cannot consider any extrinsic evidence."). The district court incorrectly stated that "Cuff was aware of the Texas indictment at the time of his appeal *and could have established facts in order for the Fifth Circuit to review the present claim*." ROA.18-30694.432. (emphasis added). This is not the case because an appellant cannot introduce new facts for the first time on appeal; the record must be developed in the district court.

In sum, Cuff has shown good cause for failing to raise the issue on direct appeal. Moreover, the prejudice from his failure to do so is likewise clear: he has lost the opportunity to obtain a ruling from the district court on the merits of the claim.

2. The government breached the agreement.

Although a defendant bears the burden of proving the underlying facts establishing a breach by a preponderance of the evidence, the Court construes a plea agreement "like a contract, seeking to determine the defendant's reasonable understanding of the agreement and construing ambiguity against

the Government." *United States v. Escobedo*, 757 F.3d 229, 233 (5th Cir. 2014). Here, there can be no question that Cuff reasonably expected that the plea agreement protected him from a prosecution in the Western District of Texas for sexual assault of the child because he agreed the conduct would be used to enhance his sentence in Louisiana. Karns's declaration makes clear that he confirmed this with both AUSA Walker and AUSA Gardes. ROA.18-30694.256. This made sense because, as Karns was told, the Texas prosecutor wanted to avoid a trial if possible in Texas where the young girl would have to testify.

The government argued in the district court that the Louisiana case and the Texas case were not based on the same investigation and not related because the Louisiana indictment dealt with child pornography, while the Texas indictment dealt with child molestation. ROA18.30694.385. This argument is specious. The government introduced the conduct underlying the child molestation charges in Texas into the sentencing for the Louisiana pornography crimes and obtained a five-level increase in the offense level because of the molestation. Therefore, the Texas offenses were, in the words of the plea agreement, "known to the United States Attorney's Office" and were based at least in part "on the investigation which forms the basis of the Second Superseding Indictment."

Pointing to language in the agreement that refers specifically "to the United States Attorney's Office" the government argued below that this language bound only the U.S. Attorney in the Western District of Louisiana, and not also the Western District of Texas, *Id.*, but the record refutes this claim.

First, the agreement specifically uses the terms, "the Government" and "United States" strongly implying that the whole government is bound. ROA.18-30694.975-977, 980.

Second, the Government did not limit that non-prosecution clause to those offenses that could have been charged in the indictment, but agreed not to prosecute Mr. Cuff for *any offense* known by the United States Attorney's Office *based on the investigation* which formed the basis of the Second Superseding Indictment. The Louisiana prosecutor has never claimed (nor could he) that he lacked knowledge of the videos that formed the potential charges in Texas at the time he sought the Second Superseding Indictment.

Third, nothing in the agreement states that it binds only the U.S. Attorney in Louisiana. The government certainly knows how to insert such a clause if it wants to. *See, e.g.*, *United States v. Al-Arian*, 514 F.3d 1184, 1193 (11th Cir. 2008) ("The plea agreement expressly binds only the United States Attorney's Office for the Middle District of Florida and the

Counterterrorism Section of the Department of Justice."); *United States v. Tovar-Valencia*, 2011 WL 6749051, at *2 (S.D.Tex. 2011) ("This Plea Agreement binds only the United States Attorney's Office for the Southern District of Texas and the Defendant; it does not bind any other United States Attorney."); *United States v. Hartwell*, 302 F.Supp.2d 609, 618 (E.D.Va. 2004) ("Except where specifically noted, this plea agreement binds only the United States Attorney's Office for the Eastern District of Virginia and the defendant; it does not bind any other prosecutor in any other jurisdiction.").

This Court rejected similar arguments made by the government in *Elashyi*, *supra*, 554 F.3d 480. In that case defendant Ishan and his brothers were convicted of illegally exporting computer equipment to Libya and Syria, among other crimes. Defendant Ishan argued his prosecution violated a plea agreement he reached in an earlier case with his company called Tetrabal. This Court agreed. In the earlier case, Ishan pled guilty to a single count of making an unlawful shipment. In return, the Government agreed it would not "seek, refer or prosecute any further criminal charges against him arising out of the facts and circumstances known by the government at this time surrounding his involvement in the crimes addressed in the superseding indictment." *Id.* at 500.

In *Elashyi*, the government's plea agreement used language very similar to that here.  In rejecting the government's argument that no breach occurred, this Court reasoned that "the Government clearly knew at the time of the plea offer about 'facts and circumstances' of the Libyan and Syrian shipments that form the basis of the current prosecution.  There is no question that the present prosecution 'arise [s] out of' those shipments."  554 F.3d at 500. This Court  went on to hold that "the language of the plea agreement in this case unambiguously extends to all crimes arising out of the conduct alleged in the Tetrabal indictment, including shipments to Libya and Syria that give rise to Ishan's convictions in the present case."  *Id.* at 500–02.

Furthermore, although this Court has apparently never decided the question, *see United States v. Cantu*, 185 F.3d 298, 305 n.11 (5th Cir. 1999), most other circuits hold that the promise of one U.S. Attorney binds other U.S. Attorneys in different districts.  *E.g.*, *United States v. Gebbie*, 294 F.3d 540, 550 (3d Cir. 2002) ("[W]hen a United States Attorney negotiates and contracts on behalf of 'the United States' or 'the Government' in a plea agreement for specific crimes, that attorney speaks for and binds all of his or her fellow United States Attorneys with respect to those same crimes and those same defendants."); *United States v. Van Thournout,* 100 F.3d 590, 594 (8th Cir. 1996) (holding that absent express limitation, any promises made by

an Assistant United States Attorney in one district will bind an Assistant United States Attorney in another district); *United States v. Randolph*, 230 F.3d 243, 249–51 (6th Cir. 2000) (when defendant pled guilty in Texas, reasonably believing that plea agreement prohibited prosecution in Tennessee, due process required reversal of conviction); *United States v. Harvey*, 791 F.2d 294, 296 n.1 (4th Cir. 1986) (reference to "the Eastern District of Virginia" in the plea agreement was ambiguous given that most of the plea agreement referred to "the United States," and construing the ambiguity against the Government, holding "that [the plea agreement] must be interpreted to prevent further prosecutions for such offenses anywhere and by any agency of Government"). *But see United States v. Annabi*, 771 F.2d 670, 672 (2d Cir. 1985) (holding that "[a] plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction").

   3. *The government misled the federal judge in Texas when it moved to seal the Texas indictment.*

The Government not only kept that fact of the Texas indictment from Mr. Cuff and his counsel prior to the plea hearing in Louisiana, it did so by misleading the Texas judge into sealing the Texas Indictment. In its motion to seal the indictment, the Texas U.S. Attorney told the judge that the

"disclosure of the existence of the [Texas] Indictment would seriously jeopardize the ability of law enforcement to locate the Defendant and apprehend him without incident." ROA.18-30694.265.

The government's reason for sealing the indictment was purely pretextual because the government well knew Cuff had been in federal custody since July 2011 when he was arrested and detained in federal district court in Texas and extradited to Louisiana. ROA.18-30694.32-34. Indeed, On January 9, 2012, the government filed the Texas detainer on his place of confinement in Louisiana. ROA.18-30694.321. The misleading of the Texas judge to keep the Texas indictment hidden from the Cuff and his lawyer was serious misconduct.

## 4. The breach of the plea agreement and the government's misconduct justifies vacating the guilty plea.

The breach of the plea agreement justifies vacating Cuff's plea of guilty for three reasons:

First, vacating the guilty plea is an appropriate remedy for breach of a plea agreement. *Santobello*, 404 U.S. at 263 (specific performance or withdrawing guilty plea appropriate remedy). That the Texas indictment was dismissed on the government's motion in 2015 because the BOP doctors concluded that Cuff was incompetent does not matter. *See id*. (whether

breach of bargain affected judge is irrelevant; case remanded to determine if specific performance or withdrawal of plea proper remedy). *Cf. United States v. Taylor*, 77 F.3d 368, 371 (11th Cir. 1996) (irrelevant that government's breach may not have influenced the sentencing judge); *United States v. Grandinetti*, 564 F.2d 723, 726–27 (5th Cir. 1977) ("The question of the effect on the district court of the prosecutor's noncompliance with the plea bargain was thus deemed irrelevant.").

Second, because the Texas indictment was obtained secretly and in violation of the plea agreement and without Mr. Cuff's knowledge before he pleaded guilty, the government deprived Cuff and his counsel of the knowledge of all the facts necessary to make an intelligent, knowing, and voluntary plea. As such, the plea should be voided. *See Bousley v. United States*, 523 U.S. 614, 618 (1998) ("A plea of guilty is constitutionally valid only to the extent it is voluntary and intelligent.").

Third, the secretive manner in which the Texas indictment was obtained prevented trial counsel Karns from rendering effective assistance of counsel. Moreover, it manifestly demonstrates prosecutorial misconduct. *Cf. Berger v. United States*, 295 U.S. 78, 88 (1935) (although the government "may strike hard blows, [it] is not at liberty to strike foul ones."); *United States v. McPhee*, 731 F.2d 1150, 1152 (5thCir. 1984) (same). Secretly filing

30

the Texas indictment and misleading the Texas judge to seal the indictment and keep the knowledge of its existence from Cuff was a "foul blow" warranting vacating of the Louisiana guilty plea.

In sum, Cuff's plea to the Louisiana indictment was induced in large part by the understanding that he would not be prosecuted in Texas. The government breached the agreement and committed misconduct by misleading the Texas judge to keep knowledge of the Texas indictment from Cuff. Therefore, Cuff should be permitted to withdraw his plea of guilty. *See Taylor*, 77 F.3d at 372 (although court of appeals has choice of remedy, in circumstances here, where government breached agreement, defendant permitted to withdraw plea). As this Court has stated:

> It is in the best interests of the government, as well as the system as a whole, that defendants be able to count on the government keeping the promises it makes in order to secure guilty pleas. Those broader interests, as well as each individual defendant's interest in receiving the benefit of his bargain, require that courts stand ready and willing to hold the government to its promises.

*Id.*

### 4. Cuff has met the threshold for issuance of a COA.

Even if this Court believes that Cuff will ultimately not prevail on appeal with respect to this issue, the Court should still issue a COA because the standard for issuance of a COA is only whether "jurists of reason would

31

find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 479 (2000); *see Buck v. Davis*, 137 S.Ct. 759, 773 (2017) (reversing this Court's misapplication of the COA standard, stating "The COA inquiry, we have emphasized, is not coextensive with a merits analysis. At the COA stage, the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.") (citations omitted).

Furthermore, "a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El v. Cockrell,* 537 U.S. 322, 338 (2003). In sum, even assuming, *arguendo*, that this Court were to ultimately deny the appeal on the merits, the Court should still grant the COA on this issue.

**B. THE COURT SHOULD GRANT A COA ON THE ISSUE OF WHETHER TRIAL COUNSEL WAS INEFFECTIVE IN NOT ADEQUATELY INVESTIGATING CUFF'S MENTAL CONDITION AND MENTAL DEFENSES BEFORE ADVISING HIM TO PLEAD GUILTY.**

"Before deciding whether to plead guilty, a defendant is entitled to the effective assistance of competent counsel." *Padilla v. Kentucky*, 559 U.S.

356, 364 (2010).  To be effective, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691 (1984).

Before advising a defendant that a guilty plea is the best defense strategy, the defense attorney must first adequately investigate the facts including the defendant's mental status and possible mental defenses. *See Diaz v. Martin*, 718 F.2d 1372, 1378 (5th Cir. 1983) (before advising a defendant to plead guilty, "[i]t is essential that counsel be familiar with the facts and the law, including potential defenses, so that he can fully advise the defendant of options available to him."); *United States v. Edwards*, 488 F.2d 1154, 1163 (5th Cir. 1974) ("This court has long recognized a particularly critical interrelation between expert psychiatric assistance and minimally effective representation of counsel.").   .

Failing to reasonably investigate the facts and circumstances of a defendant's psychological health and mental state before formulating a defense strategy can rise to the level of ineffective assistance. *See Escamilla v. Stephens*, 749 F.3d 380, 392 (5th Cir. 2014) ("if a purportedly tactical decision is not preceded by a reasonable investigation, then it is not sufficiently informed and not entitled to the deference typically afforded

33

counsel's choices"); *Weeden v. Johnson*, 854 F.3d 1063 (9th Cir. 2017) (trial counsel ineffective in failing to investigate psychological evidence about effect of petitioner's mental state before formulating defense strategy).

Attorney Karns did not conduct the necessary investigation into Cuff's mental state and history with mefloquine before advising him to plead guilty. Only *after* Cuff entered his guilty plea on March 5, 2012, did Karns learn that Cuff had taken mefloquine during his military service, a powerful anti-malarial drug that can cause irreparable brain damage. ROA.18-30694.1073. at ¶12. Only after the guilty plea did Karns move *ex-parte* for authorization to hire a psychologist and other experts to conduct testing on Cuff "to diagnose mental and brain disorders from which Mr. Cuff suffers as a result of exposure to traumatic combat events and exposure to medications known to cause adverse psychiatric effects including depression and psychosis." ROA.18-30694.1072. at ¶5.

Only on May 10, 2012, well after the plea of guilty, did Dr. Remington Nevin determine that Cuff's symptoms were consistent with the deleterious effects of mefloquine. ROA.18-30694.1224-1226. Only after entry of the guilty plea did Karns learn that Dr. Nevin diagnosed Cuff as suffering from "limbic encephalopathy caused by use of mefloquine," a condition whose symptoms can be bizarre, unusual, and cause criminal conduct. ROA.18-

3094.1098. at ¶7.

Only after entry of the guilty plea did Dr. Nevin evaluate the records related to Cuff and determine that he likely "suffered a deep brain or limbic seizure" related to neurotoxicity from his early use of mefloquine, and that his condition was "chronic and unstable." ROA.18-30694.1328. Only after entry of the guilty plea did Karns learn that both Dr. Nevin and Dr. Stanulis concurred that "Mr. Cuff's changes in sexual disinhibition and behavior are to a reasonable degree of medical certainty the result of mefloquine encephalopathy and neurotoxicity." ROA.18-30694.1214-1218, 1326. Only after entry of the guilty plea did Karns learn that Dr. Stanulis concluded that "Mr. Cuff's illegal behavior is the result of the adverse reaction to the mefloquine he was ordered to take in a combat zone" and that in his opinion, "this fact did not emerge until after Mr. Cuff's pleas, and was not factored into either his charges or potential defenses." *Id*.

Karns failure to do the investigation into Cuff's mental status before advising Cuff to plead guilty and his failure to learn about the Cuff's use of mefloquine and the brain damage associated with that use before advising Cuff to plead guilty was ineffective assistance.

In denying the Section 2255 motion, the district court stated that Karns's decision not to pursue a mental defense such as an insanity or

diminished capacity defense "was strategic in the hopes of getting Cuff the best possible deal." ROA.18-30694.436. But an attorney's decision cannot be strategic if he has not uncovered the relevant facts that underlie the decision. *See e.g.*, *Escamilla*, *supra*, 749 F.3d at 392; *Anderson v. Johnson*, 338 F.3d 382, 392 (5th Cir. 2003) ( "counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when [he] has not yet obtained the facts on which such a decision could be made.").

Moreover, the district court's assertion is merely the court's *ipse dixit*. Nothing in the record supports the trial judge's bald conclusion. There is no declaration or testimony from Karns or any other person asserting that Karns' decision was strategic. There was no evidentiary hearing. It is well-settled that findings and conclusions of the district court are clearly erroneous if not supported by the record. *See, e.g.*, *Cook v. U.S. Atty. Gen.*, 488 F.2d 667, 672 (5th Cir. 1973) ("This finding will not withstand the modest scrutiny required by the clearly erroneous rule since it is simply not supported by the record."). The record supports the conclusion that Karns's failure was not a product of strategy, but a product of a failure to investigate, of negligence, and of deficient performance.

It may be that this Court will ultimately deny the appeal on the merits of this issue. However, because reasonable jurists could differ on whether

Karns adequately investigated Cuff's prior use of mefloquine, the effects of that use on Cuff's mental state and his competence to plead guilty, and whether there were available mental defenses, this Court should issue a COA.

### C. THE COURT SHOULD GRANT A COA ON THE ISSUE OF WHETHER TRIAL COUNSEL WAS INEFFECTIVE IN NOT MOVING FOR A COMPETENCY HEARING BEFORE SENTENCING.

To be legally competent the defendant must have "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). Trial counsel has a duty to reasonably investigate any competency issues related to his or her client, and failure to do so may rise to the level of ineffective assistance. *See Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990).

Upon reviewing the reports of Dr. Nevin and Dr. Stanulis, and because of certain incoherent statement made by Cuff at the plea hearing, Karns should have moved for a competency hearing under 18 U.S.C. § 4241 before entry of the guilty plea and, at the very least, before sentencing took place. *See Bouchillon*, 907 F.2d at 597 (trial counsel ineffective in failing to investigate client's competence). Furthermore, the district court had a *sua sponte* duty to call for such a hearing. *See Mata v. Johnson*, 210 F.3d 324, 330 (5th Cir. 2000) (court "must conduct an inquiry into the defendant's

mental capacity, either *sua sponte* or in response to a motion by petitioner's counsel, if the evidence raises a bona fide doubt as to his competency.").

> *1. Cuff's strange and incoherent statements at the plea hearing and his assertion that he had PTSD but "believed" it was not affecting him were red flags strongly suggesting there was an issue with competence even at that stage of the proceeding.*

At a chambers conference before the entry of the plea, Karns alerted the district court to the problems with Cuff's mental status.  ROA.18-30694.884. At the time that Cuff entered his plea of guilty, the district court asked him if he had medical problems in the past.  He responded somewhat strangely and incoherently:  "I was told I did, but I was helped out of the questioning [sic]. When you leave a war zone, they – the corpsman would help me do the paperwork so I wouldn't fail it. [sic]." ROA.18-30694.861.  This strange and illogical answer is indicative of a thought disorder or mental disturbance of some kind.  The district court then asked Cuff if he suffered from post-traumatic stress syndrome, and he responded, "I was told I did since Somalia, Your Honor."  *Id*.  The court then asked whether Cuff had recovered from the PTSD, and Mr. Cuff responded, "No, Your Honor." ROA.18-30694.861-862. The Court then asked Cuff whether he was being actively treated for the PTSD, and he responded that he was just starting treatment. ROA.18-30694.862. Finally, the Court asked Cuff if was on any kind of medication, and he responded he was not. *Id*.

Cuff's illogical and strange answers and his statement that he had not recovered from PTSD, should have raised a question for both trial counsel and the district court as to whether Cuff was competent to plead, much less to be sentenced. Indeed, the district court recognized a problem with Cuff's mental state because later in the plea colloquy, the court stated:

> In discussions held off the record before we convened today, I am concerned over not a mental competency issue, I'm concerned over a mental status issue, and I have provided counsel with the name of a local Ph.D. psychologist, clinical psychologist, who can conduct that. I am concerned that he may need to be on medication -- I don't know the answer to that.

ROA.18-30694.884. It is difficult to understand how one can be concerned about Cuff's "mental status" yet not be concerned about his mental competence.

It is true that in its memorandum decision on direct appeal, this Court stated that during the plea colloquy Cuff responded to questions appropriately with no indication of mental deficiencies. ROA.18-30694.214-215. In so finding, the Court overlooked the incoherent answers Cuff gave to the trial judge. In any event, the issue here concerns Cuff's competence to be sentenced, which this Court did not address. As shown below, Cuff's mental health deteriorated substantially in the eight months between the time of the plea and the time of sentencing.

At the plea colloquy Cuff told the trial court he was suffering from PTSD and had not recovered from that disorder. PTSD is a serious mental illness arising from experiencing, witnessing, or hearing about traumatic events. "PTSD is not uncommon among veterans returning from combat." *Porter v. McCollum*, 558 U.S. 30, 36 (2009). Symptoms include "behaving recklessly or in a self-destructive way." Diagnostic and Statistical Manual of Mental Disorders (DSM-V) (criterion E for PTSD). They also include "having problems concentrating, experiencing events as if one were an outside observer of or detached from oneself (e.g., feeling as if 'this is not happening to me' or one were in a dream)," or experiencing events as "unreality, distance, or distortion (e.g., 'things are not real')." *Id.* PTSD can be "a grave affliction." *United States v. Cantu*, 12 F.3d 1506, 1513 (9th Cir. 1993). The symptoms of PTSD can seriously impair a defendant's ability to understand legal proceedings and assist his attorney.

> *2. The reports of Drs. Nevin and Stanulis with respect to brain damage caused by mefloquine raised serious questions as to Cuff's competence to be sentenced.*

On May 10, 2012, two months before sentencing, Dr. Nevin examined Mr. Cuff's medical history and consulted with him by phone. Dr. Nevin concluded that Cuff's personality changes, profound impairment in short-term memory, abnormal dreams, and anxiety and paranoid reactions were

40

"consistent with possible late neurotoxic effects of limbic encephalopathy caused by repeated mefloquine intoxication." ROA.18-30694.567,1225. Dr. Nevin observed that mefloquine intoxication has been associated with "a morbid fascination with violence and violent objects, aggression, increased impulsivity, and sexual inhibition." *Id*.

On about May 18, 2012, Mr. Cuff was found unresponsive after complaining the evening before of a headache. *Id*. at 33. He was taken to LSU Health Sciences Center where he was admitted with a diagnosis of "altered level of consciousness and altered mental status, with a Glasgow Coma Scale of 3." *Id.* In Dr. Nevin's opinion, Cuff's symptoms were "highly suspicious for a deep brain or brainstem seizure" and provided "further support for the diagnosis of neurotoxic injury from his earlier use of mefloquine." *Id.* Dr. Nevin reviewed additional records and concluded that they "further substantiate the assessment" that Cuff likely "suffered a deep brain or limbic seizure related to neurotoxicity from his early use of mefloquine," and that his condition was "chronic and unstable." *Id*.

At the sentencing hearing on July 13, 2012, attorney Schweitzer presented the reports of Dr. Nevin and Dr. Stanulis opining that Cuff suffered from encephalopathy (brain damage) from his early use of mefloquine, and

that such damage contributed to his criminal conduct. These reports were red flags on the issue of Cuff's competence to be sentenced.

### 3. Highly qualified and experienced mental health experts believe that before sentencing Cuff's deteriorating mental health required a competency evaluation and hearing.

The mental health experts who examined Cuff before and after his sentencing were of the view that trial counsel should have sought a competency determination before Cuff was sentenced.

Dr. William Brown, Ph.D., was retained to do a sociological evaluation of Cuff for sentencing. He had significant experience working cases involving competency of criminal defendants. ROA.18-30694.1553-1557. During his interviews of Cuff, he found that Cuff frequently acted in an "irrational manner." ROA.18-30694.1556. Dr. Brown shared his concerns with Karns and with Dr. Stanulis. *Id.* In Dr. Brown's opinion, "Mr. Cuff's competency should have been questioned by trial counsel based on his interactions with Mr. Cuff and his family in January 2012, and based on all the information known about Mr. Cuff prior to his sentencing." ROA.18-30694.1557.

On December 6, 2014, Dr. Stanulis filed a declaration respecting his opinion on Cuff's competency to be sentenced. ROA.18-30694.1575-1579. He declared that during his interviews of Cuff, he found him to be "slow to

respond, distractible and at times irrational." ROA.18-30694.1576. Dr.

Stanulis observed Cuff's "irrational thinking in his interactions" with Karns.

*Id*. In his opinion Cuff's mental condition was "severely impaired" before

sentencing took place. ROA.18-30694.1578. Dr Stanulis reviewed a letter

of April 4, 2014 from BOP psychiatrist, Dr. Herbel, in which Dr. Herbel

found Cuff incompetent to proceed in the Texas case. ROA.18-30694. 579.

Dr. Stanulis concluded that Cuff's "impaired mental condition was present to

a severe and incapacitating degree and that it rendered him incompetent" in

the proceedings before Judge Hicks. *Id*. Dr. Stanulis declared that in his

opinion Mr. Cuff's competency should have been investigated before the

guilty plea hearing but in any event "at a minimum… before Mr. Cuff was

sentenced." ROA.18-30694.1579. This is particularly true, declared Dr.

Stanulis, in light of Cuff's "hospitalization at LSU." *Id*.

Dr. Susan J. Fiester, received her M.D. from the Yale School of

Medicine and is Board Certified in by the American Board of Psychiatry and

Neurology. ROA.18-30694.1604-1617. She was the expert forensic

psychiatrist who examined and evaluated Mr. Cuff on behalf of the defense

in the Texas prosecution. She submitted an eighteen-page affidavit that

reviewed Mr. Cuff's mental condition and summarized the findings of the

many psychological, psychiatric, and social history reports.  ROA.18-30694.1586-1603.

Dr. Fiester reported that examinations near the time of  Cuff's sentencing showed the following symptoms and dysfunction which, considered together, should have raised serious questions about his competency to be sentenced: depression and psychomotor retardation, impairment in judgment and insight, short-term memory problems, difficulty with concentration, difficulty following multiple conversations, difficulty with Intellectual processing, difficulty assembling his thoughts, depersonalization and global paranoia.  ROA.18-30694.1602.

According to Dr. Fiester, Cuff also suffered many physical symptoms, including: severe headaches and dizziness (that had previously interfered with his expert evaluations) and sleep problems, leading to sleep deprivation and fatigue) that may have significantly interfered with memory and the cognitive and intellectual functions essential to competency. ROA.18-30694.1602.

Dr. Fiester reported that the reports of Dr.  Byron Herbel supported her opinion that Cuff's mental condition continued to deteriorate as predicted by other experts.  Dr. Herbel is Cuff's treating psychiatrist at Butner Federal Medical Center and is the Bureau of Prisons' expert retained to oversee and

treat Mr. Cuff's mental condition for the Western District of Texas prosecution. *Id.*

It is Dr. Fiester's professional opinion to a degree of reasonable medical certainty, that "based on the evidence of Mr. Cuff's worsening mental state and extensive evidence of his overall deteriorated condition prior to the July 2012 sentencing that defense counsel should have arranged for a forensic psychiatric expert evaluation of Mr. Cuff to determine if he was competent for sentencing." ROA.18-30649.1603.

Tellingly, because of Cuff's incompetence to proceed, on February 17, 2015, the AUSA in the Western District of Texas moved to dismiss the Texas indictment, and Judge Kathleen Cardone granted the motion. Appendix 1. This supports the conclusion that Cuff's mental status was progressively worsening and that his competence should have been evaluated before sentence was imposed.

6. Cuff's attorney on direct appeal reported contemporaneous to the sentencing hearing that Cuff's mental health had deteriorated.

On August 17 and 18, 2012, Mr. Cuff was visited by his counsel representing him on direct appeal, Herbert Larson, Jr., and Sara Johnson. ROA.18-30694.1618. Mr. Larson and Ms. Johnson observed Mr. Cuff to have "a very 'flat' affect; this is, he did not respond with emotion to anything that [his counsel] said; nor did he express any emotion with regard to any

matters that he was discussing, even though some of these matters were . . . highly charged emotionally." *Id*.  Cuff complained to counsel of nightly nightmares and daydreams, and "could not always distinguish the difference between what was real and what was imagined." Cuff "was 'having problems with reality." ROA.18-30694.1619.   These observations by Mr. Larson and Ms. Johnson, made just over a month after the sentencing hearing on July 13, 2012, add support to Dr. Stanulis's and Dr. Fiester's opinions that a competency hearing should have been sought by trial counsel before the sentencing hearing.

> *5. Cuff's statement at the guilty plea hearing that he did not believe he had a mental illness is not dispositive.*

In its opinion denying the Section 2255 motion, the district court relied upon Cuff's response at the plea colloquy that he did "not believe" that he had a mental health problem that would limit his ability to understand what was happening.  Cuff's statement is hardly a definitive statement of competency.  Moreover, the failure of certain mentally ill persons to recognize their illness or the effect it is having is a well-known syndrome called Anosognosia.  In the words of one court, it is "the failure to appreciate one's own illness." *Struck v. Cook County Public Guardian*, 901 N.E.2d 946, 948 (Ill. App. 2008).  Anosognosia is a common consequence of brain injuries.  "A person grappling with a serious mental illness…cannot be

assumed to have a reliable understanding of his faculties." *See Anderson v. United States*, 865 F.3d 914, 920 (7th Cir. 2017) (when defendant suffering from multiple mental illnesses responded "as good as I can" to court's question whether he understood what was happening, his reply acknowledged "some inability to think clearly and participate in the proceedings").   .

In its opinion the district court relied on the principle that statements in "open court during a plea hearing carry a strong presumption of verity." *United States v. Martinez-Molina*, 64 F.3d 719, 733 (5th Cir. 1995) (citing *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)).  While this principle is true in general, it applies with much less force in the case of a person who suffers from a mental illness.  *See, e.g.*, *Anderson*, 865 F.3d at 920 ("Anderson's belief about the effects of his medication is inadequate assurance that he was capable of entering a plea: A person grappling with a serious mental illness or under the influence of psychotropic drugs cannot be assumed to have a reliable understanding of his faculties.").

Additionally, Cuff's mental health was deteriorating between the time of the plea and the time of sentencing.  Thus, Cuff's statement about his competence at the time of plea hearing is not determinative of his competence at sentencing, which occurred about eight months later.

47

### 6. Mr. Karns' opinion of Cuff's competence is not dispositive.

In finding that Cuff was competent to be sentenced, the district court relied on the opinion of trial counsel Karns at the time of the plea that Cuff was competent to proceed. This reasoning is flawed because Karns' opinion as to Cuff's mental state at the time of the plea is not dispositive of Cuff's mental state at the time of the plea much less at the time of sentencing eight months later.

Furthermore, while it is true that in the usual case trial counsel's opinion as to his client's mental state appropriately carries great weight, the law is clear that lawyers have no special ability to diagnose mental illnesses and their effects on their clients' mental state. *See Bouchillon*, 907 F.2d at 593–94 ("the state court, in reviewing Bouchillon's petition, relied almost exclusively on the evidence of Bouchillon's demeanor at the plea proceeding and the testimony of his trial counsel to hold that he was competent . . . [T]he existence of even a severe psychiatric defect is not always apparent to laymen . . . . One need not be catatonic, raving or frothing, to be [legally incompetent.]") (citations omitted); *Maxwell v. Roe*, 606 F.3d 561, 574 (9th Cir. 2010) ("[A]lthough we acknowledge that defense counsel will often have the best-informed view of the defendant's ability to participate in his defense, we have recognized that counsel is not a trained mental health professional

48

and his failure to raise petitioner's competence does not establish that petitioner was competent.") (citations omitted). Therefore, Karns' opinion at the time of the guilty plea is not dispositive of Cuff's mental state at that time, much less at the time of sentencing.

In sum, given Cuff's worsening mental state between the plea and the sentencing, Karns should have moved for competency hearing before the court imposed a sentence. His failure to do so was ineffective assistance. Ultimately, it may be that this Court will deny the appeal on the merits of this issue. However, because reasonable jurists could differ on whether Karns should have requested a competency hearing before sentence was imposed, this Court should issue a COA.

## D. THE COURT SHOULD GRANT A COA ON THE ISSUE OF WHETHER THE TRIAL COURT'S ABUSED ITS DISCRETION IN DENYING THE RULE 59 MOTION.[1]

Fed. R. Civ. P. 59 (e) grants the court the power to alter or amend its judgment. A motion under this rule "serves the narrow purpose of allowing a party to correct manifest errors of law or fact *or to present newly discovered evidence*." *Waltman v. International Paper Co*., 875 F.2d 468, 473 (5th Cir. 1989) (emphasis added). The district court has broad discretion with respect

---

[1] Cuff is not certain whether a COA is necessary to appeal the denial of this motion, but he seeks one in an abundance of caution.

to granting this motion, but "reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." *Id*. at 479.  In exercising its discretion, "a district court must strike the proper balance between the need for finality and the need to render just decisions on the basis of all the facts." *Hale v. Townley*, 45 F.3d 914, 921 (5th Cir. 1995).

Cuff's Rule 59 motion was based on new evidence that was not before the district court when the court denied the 2255 motion.  At the sentencing hearing on July 13, 2012, attorney Schweitzer presented the reports of Drs. Nevin and Stanulis concluding that Cuff suffered from limbic encephalopathy (brain damage) from his early use of mefloquine, and that such damage contributed to his criminal conduct.  The district court disagreed with and was highly skeptical of these conclusions.  See ROA.18-30694.890. lines: 10-11 ("I realize you say it's unquestionably.  I question that myself with respect to those conclusions [of Dr. Nevin]."); ROA.18-30694.891. ("Nor does it mean that I have to accept [Dr. Nevin's conclusion] on its face, as an expert opinion.").

The district court was of the view that the conclusion of Drs. Nevin and Stanulis respecting the effects of mefloqine were "more cutting-edge theory than . . . accepted fact."  ROA.18-30694.893. The court went on to say, "On its face, [the conclusion of Dr. Nevin] does not meet a *Daubert*

50

standard, in the Court's opinion.  The Court finds that this is a cutting-edge
issue and is by no means accepted fact." *Id.*   ROA.18-30694.919(that Cuff
has encephalopathy "is a theory, supposition.  The perseveration is consistent
with but is not diagnosed as encephalopathy.").

In his Rule 59 motion, Cuff asked the court to reconsider its skepticism
of the conclusions of Dr. Nevin and Dr. Stanulis in light of the new exhibits
and new evidence presented in the motion.  This evidence was discovered
after April 4, 2014, the date the 2255 motion was filed and had not been seen
by the district court.  The court denied the Rule 59 motion saying, in essence,
that Cuff had presented nothing new.  In so holding the district court failed to
adequately consider the following items of new evidence presented in the
Rule 59 motion and, therefore, abused its discretion.

### 1. The Bureau of Prisons health report by Dr. Vynedra Smith diagnosing Cuff with mefloqine brain disorder.

Cuff presented a Health Services Report from the Bureau of Prisons
(Exhibit 12 to the Rule 59 motion).  ROA.18-30694.699-732. The report
noted that as of January 9, 2018, Dr. Vynedra Smith diagnosed Cuff as
suffering, among other illnesses from "*mefloquine brain disorder.*"  ROA.18-
30694.710 (emphasis added).  ROA.18-30694.719. Cuff was also diagnosed
as suffering from non-Hodgkin's "stage IV diffuse large B cell lymphoma," a
type of blood cancer.  ROA.18-30694.710.

Dr. Smith's conclusion that Cuff suffered from "Mefloquine brain disorder," was significant new evidence that confirmed the conclusions of Drs. Nevin and Stanulis that at the time of his criminal conduct, Cuff was suffering from a brain disorder caused by use of mefloquine. This evidence should have substantially undermined the district court's skepticism and conclusions in its judgment denying the Section 2255 motion.

### 2. New evidence of brain damage caused by antimalarial drug mefloquine regarding members of the U.K. military.

Cuff introduced an article by Ashley Croft published November 12, 2015, in the Pharmaceutical Journal, *Mefloquine, Madness, and the Ministry of Defence* (Exhibit 6 to Rule 59 motion). ROA.18.30694.638-643. The article argued that the "overwhelming evidence about the dangers of long-term use of mefloquine leaves the UK Ministry of Defense little excuse to continue giving this drug." ROA.18.30694.638. Evidence that the United Kingdom was being advised to discontinue the use of mefloquine was significant new evidence not previously presented to the district court. The evidence also confirmed the conclusions of Dr. Nevin and Dr. Stanulis with respect to the deleterious effects of mefloquine.

### 3. New evidence of a scientific study regarding neuropsychiatric symptoms in military members and the change in the military's position regarding mefloquine.

Cuff presented a study published on June 8, 2016 by Livezy, Oliver, & Cantilena, *Prolonged Neuropsychiatric Symptoms in a Military Service Member Exposed to Mefloquine* (Exhibit 1 to Rule 59 motion).  ROA.18-30694.513-518. This study presented new evidence to the district court that "Due to the increasing awareness of these neuropsychiatric side effects, the United States military relegated mefloquine to a third-line medication behind doxycycline and Malarone (atovaquone-proguanil) for prophylaxis in areas of chloroquine-resistant malaria, such as Afghanistan.  Consequently, from 2008 to 2013, the use of mefloquine in the military has decreased dramatically." *Id*. at 516.  The study emphasized that "[m]efloquine-induced neuropsychiatric symptoms can be severely life debilitating [and] Mefloquine toxicity can persist for several years after exposure has been discontinued, with little to no abatement in symptoms over time." *Id*.

This significant new evidence was not seen before by the district court. The evidence also confirmed the conclusions of Dr. Nevin and Dr .Stanulis that Cuff may well have suffered from brain damage related to the effects of mefloquine.

#### 4. New evidence of mental health disorders connected to the use of mefloquine.

Cuff presented and article published 2015 from Academy of Psychosomatic Medicine, *Depersonalization/Derealization Disorder after Exposure to Mefloquine* (Exhibit 2 to Rule 59 motion). ROA.18-30694.526-530. Authored by Doctors Katherine McEvoy, Blair Anton, and Margaret S. Chisolm, the article reviews the case studies of persons suffering psychiatric symptoms from mefloquine use, namely "depersonalization/derealization disorder" (DDD). According to the authors, DDD "attacks the core of one's core sense of self." ROA.18-30694.527. This study supports the conclusions of Dr. Nevin and Dr. Stanulis that Cuff suffered brain damage from the use of mefloquine that could have contributed to his sexual disinhibition and criminal conduct.

#### 5. New evidence of debilitating effect of behavioral disorders connected to the use of mefloquine.

Cuff presented an article published 2015, *Behavioral effects of Mefloquine in tail suspension and light/dark tests* (Exhibit 3 to Rule 59 motion). ROA.18-30694.519-525. Authored by John Michael Holden, Richard Slivicki, Rachel Dahl, Xia Dong, Matt Dwyer, Weston Holley, and Crissa Knott, the article noted that "[i]n the past 10-15 years concerns about mefloquine's neuropsychiatric side effects have grown." This significant

new evidence was not seen before by the district court.  The evidence also

confirmed the conclusions of Dr. Nevin and Dr. Stanulis that Cuff may well

have suffered brain damage from the use of mefloquine.

      6. New evidence of findings about Mefloquine Intoxication Syndrome.

      Cuff presented an article published 2015 by Dr. Remington Nevin and

Dr. Elspeth Ritchie, *The Mefloquine Intoxication Syndrome*: *A Significant

Potential Confounder in the Diagnosis and Management of PTSD and Other

Chronic Deployment-Related Neuropsychiatric Disorders* (Exhibit 10 to Rule

59 motion).  ROA.18-30694.662-683. The authors observe that acute

mefloquine intoxication "may produce vivid, hyper-realistic nightmares that

may precede a manic, paranoid, dissociative or confuse psychosis, often

marred by horrific auditory and visual hallucinations."  ROA.18-30694.662.

They also observe that commonly reported symptoms of acute mefloquine

intoxication include "anxiety, paranoia, and persecutory mania, panic attacks,

emotional liability and aggression." ROA.18-30694.666. The symptoms also

include "psychosis, magical thinking, grandiose thoughts . . . and delusions."

*Id*.

      This significant new evidence was not seen before by the district court.

The evidence confirms the conclusion of Dr. Nevin and Dr Stanulis that that

Cuff may well have suffered brain damage related to the effects of mefloquine.

### 7. New evidence of debilitating effect of behavioral disorders connected to the use of mefloquine and resulting rare use of the drug by U.S. military.

Cuff presented an article published October, 2016 in the *Federal Practitioner*, authored by Dr. Nevin and Dr. Ritchie, *FDA Black Box, VA Red ink?* (Exhibit 9 to Rule 59 motion) ROA.18-30694.657-661. The authors observe that in July 2013, the Food and Drug Administration "included a black box warning describing [neuropsychiatric reactions which] potentially could persist long after the drug has been discontinued . . . . Consequently, more than a quarter century after its introduction, mefloquine now is only rarely prescribed to members of the U.S. military." ROA.18-30694.657.

This significant new evidence was not seen before by the district court. The evidence also confirmed the conclusions of Dr. Nevin and Dr Stanulis that that Cuff may well have suffered from brain damage from his use of mefloquine.

### 8. New evidence of a petition for guardianship filed by Cuff's wife and sister alleging Cuff was incompetent to handle his own affairs.

As Exhibit 13 to the Rule 59 motion, Cuff presented a petition for Guardianship that had been filed by his sister and his wife in the Circuit

Court of Harrison, Mississippi on November 17, 2017. ROA.18-30694.733-738. In the petition, both Cuff's mother and sister agree that Cuff was incompetent to handle his own affairs and was in need of a guardian. *Id*. This significant new evidence was not seen before by the district court. The evidence also confirmed the diagnosis of Dr. Nevin and Dr. Stanulis that Cuff may well have suffered from brain damage from his use of mefloquine. As of this date the petition has not yet been acted upon.

9. <u>New evidence that Dr. Nevin's conclusions are now part of Cuff's Navy medical records.</u>

As Exhibit 4 to the Rule 59 motion, Cuff presented Cuff's Navy medical records to the district court which contain Dr. Nevin's reports and diagnoses respecting Cuff's neurological damage stemming from his use of mefloquine. *See* District Court Docket 763-4, pages 31-38. (For reasons unknown, undersigned counsel has been unable to determine the electronic record number on appeal assigned to these records). Evidence that Cuff's Navy medical records now contain the diagnosis of Dr. Nevin should have persuaded the district court to reconsider its skepticism of the conclusions of Dr. Nevin and Dr. Stanulis.

*In sum*, in his Rule 59 motion, Cuff adduced nine new exhibits presenting evidence that was discovered after the date of the filing of the 2255 motion. Taken separately and together, the new evidence strongly

57

supported the conclusions of Drs. Nevin and Stanulis that Cuff suffered from brain damage from the use of mefloquine that may well have contributed to his criminal conduct. This new evidence should have substantially undermined the district court's skepticism about the conclusions of Dr. Nevin and Dr. Stanulis. The district judge's finding that nothing presented in the Rule 59 motion persuaded him to change his mind about the merits of the 2255 motion demonstrates the court's failure to adequately consider and weight relevant new evidence. In short, the district court's denial of the Rule 59 motion demonstrates a clear abuse of discretion.

It may be that this Court will ultimately deny the appeal on the merits of this issue. However, because reasonable jurists could differ on whether the district court abused its discretion in denying the Rule 59 motion, this Court should grant a COA on this issue.

## CONCLUSION

The issue presently before this Court is not whether Cuff will ultimately prevail on the merits of any of his claims. That remains to be seen. But he certainly meets the test established by the Supreme Court in *Miller-El v. Cockrell*, 537 U.S. 322, 326 (2003) for the issuance of a COA:

> Consistent with our prior precedent and the text of the habeas corpus statute, we reiterate that a prisoner seeking a COA need only demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c) (2). A petitioner

58

satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. *Slack, supra,* at 484, 120 S.Ct. 1595. Applying these principles to petitioner's application, we conclude a COA should have issued.

As in *Miller-El*, the Court should issue a COA here with respect to each of the claims set forth above.

Respectfully Submitted:

/s/*Michael R. Levine*
Michael R. Levine

# APPENDIX



# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | NO. EP:11-CR-03016-KC |
| | § | |
| ROBERT E. CUFF | § | |
| | § | |
| Defendant, | § | |
| | § | |

## ORDER OF DISMISSAL

Pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, and by leave of

Court endorsed herein, the Acting United States Attorney for the Western District of Texas

hereby dismisses without prejudice the Criminal Indictment pending against Defendant,

**ROBERT E. CUFF.**

Respectfully submitted,

RICHARD L. DURBIN
ACTING UNITED STATES ATTORNEY

BY:

IAN MARTINEZ HANNA
Assistant U.S. Attorney
Texas Bar #24057885
700 E. San Antonio, Suite 200
El Paso, Texas 79901
(915) 534-6884

Leave of Court is granted for the filing of the foregoing dismissal.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE

DATE:

# CERTIFICATE OF COMPLIANCE

I certify that the accompanying brief is in "14" type and contains 12,532

words excluding the Table Contents and Table of the Authorities.


/s/ *Michael R. Levine*

## CERTIFICATE OF SERVICE

I, Michael R. Levine, hereby certify that I caused to be served the

above Brief in Support of Motion for a Certificate of Appealability by ECF in

the Western District of Louisiana.  All parties are signed on to this service.

/s/ *Michael R. Levine*
Michael R. Levine
Levine & McHenry
1001 S.W. Fifth Avenue, Suite 1414
Portland, Oregon 97204
Phone:  503-546-3927
Cell:     503-939-4334
Facsimile:  503-224-3203
Email: michael@levinemchenry.com